# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Paul E. Plunkett | Sitting Judge if Other than Assigned Judge | Arlander Keys |
|---|---|---|---|
| **CASE NUMBER** | 99 C 6425 | **DATE** | 7/25/2000 |
| **CASE TITLE** | CFTC vs. Nicholas J. Nickolaou | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Report and Recommendation regarding the Commodity Futures Trading Commission's Motion to Reconsider Award of In Forma Pauperis Status to Defendant Nicholas Nickolaou; and whether criminal or civil contempt should be considered by the District Court is hereby submitted to Judge Plunkett. This Court recommends that the Motion to Reconsider Award of In Forma Pauperis Status be granted, but that Defendant Nickolaou not be held in either civil or criminal contempt.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | 2 number of notices | |
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | | JUL 26 2000 | |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | | docketing deputy initials | 68 |
| | Mail AO 450 form. | | | 7/25/2000 | |
| ✓ | Copy to judge/magistrate judge. | | | date mailed notice | |
| VKD | courtroom deputy's initials | | '00 JUL 25 PM 5:03 | VKD mailing deputy initials | |
| | | | Date/time received in central Clerk's Office | | |

COMMODITY FUTURES TRADING
COMMISSION,

   Plaintiff,

    v.

NICHOLAS J. NICKOLAOU,
individually and d/b/a CA-NI
INDUSTRIES, LTD., a general
partnership,

   Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 99 C 6425

Judge Paul E. Plunkett

Magistrate Judge
Arlander Keys

**DOCKETED**

**JUL 2 6 2000**

TO: THE HONORABLE PAUL E. PLUNKETT
   UNITED STATES DISTRICT JUDGE

## REPORT AND RECOMMENDATION

   This matter was referred to the Court for a Report and Recommendation concerning: the Commodity Futures Trading Commission's Motion to Reconsider Award of In Forma Pauperis Status to Defendant Nicholas Nickolaou; and whether criminal or civil contempt should be considered by the District Court. For the following reasons, this Court recommends that the Motion to Reconsider Award of In Forma Pauperis Status be granted, but that Defendant Nicholas Nickolaou not be held in either civil or criminal contempt.

## FINDINGS OF FACT

### I. Background



Defendant Nicholas Nickolaou is 49% owner[1] of Defendant Ca-Ni
Industries, Ltd. ("Ca-Ni") (collectively Mr. Nickolaou and Ca-Ni
are referred to herein as "Defendants").    Through Ca-Ni, Mr.
Nickolaou markets a computer-aided trading program called "Wisdom
of the Ages." Wisdom of the Ages is designed for trading commodity
futures and other investment instruments.    Plaintiff Commodity
Futures Trading Commission ("the CFTC") filed its Complaint (for
preliminary injunction) on September 30, 1999, alleging that, in
advertisements,   and   in   other   correspondence   with   potential
customers for Wisdom of the Ages, Defendants violated the Commodity
Exchange  Act  by  making  numerous  claims  which  were  false,
misleading, and fraudulent.

On October 12, 1999, Mr. Nickolaou moved for the appointment
of counsel and the right to proceed without prepayment of fees.   In
his motion for appointment of counsel, Mr. Nickolaou attested that
he was "unable to afford the services of an attorney."  He added on
the same form, "I HAVE NO KNOWLEDGE ON HOW TO PROCEED IN FORMA
PAUPERIS."

In his application to proceed without prepayment of fees and
the accompanying affidavit, Mr. Nickolaou attested that he was not

---

[1]His wife, Audrey Nickolaou, who inexplicably is not named
as a co-defendant in this case, controls the other 51% of Ca-Ni.

currently employed (he failed to answer the next question, which required the date of last employment, among other things) and that in the past twelve months, he had not received any money from any source except social security. He further stated that the amount he received was less than $1,000 per month and that the total amount he had in cash or checking/savings accounts was approximately $2,300. Mr. Nickolaou also stated that he did not own any real estate, stocks, bonds, securities, other financial instruments, automobiles, or other valuable property. Finally, he wrote that his wife and three children were dependent upon him for their support. Both motions were granted by (then) District Judge Ann C. Williams on October 12, 1999.[2]

On November 19, 1999, Mr. Nickolaou was ordered to provide disclosures to the Court (and copies to the CFTC) regarding the finances and financial condition of Ca-Ni and World Wide Financial Traders Association, Ltd. ("WWFTA"), a Belize corporation. Pursuant to this Order, on December 8, 1999, Mr. Nickolaou sent a letter to Judge Williams and a copy to this Court (Mr. Nickolaou sent an edited version to the CFTC). Although the letter purported

---

[2]Mr. Nickolaou actually ended up with a succession of different court appointed lawyers due to withdrawals based on conflicts.

to have tax returns attached, the CFTC did not receive such documents. (Declaration of Mary Elizabeth Spear [the "Spear Declaration"] at 2.) On December 27, 1999, the CFTC's application for preliminary injunction was granted by Chief District Judge Marvin E. Aspen. A related Consent Order was entered on that same date. The Consent Order included language in paragraph three that prohibited Defendants from "directly or indirectly dissipating, withdrawing, transferring, removing, concealing or disposing of cash, cashier's checks, funds, assets or other property of, or within the custody, control or possession of, Defendants, wherever located. . . ." Paragraph four of the Consent Order also stated that:

> [e]ach firm, corporation, bank or other person or entity with notice of this Order which holds, or which is a depository of, funds, securities, property, or other assets of or under the control of [Defendants] . . . . is prohibited from transferring, withdrawing, removing, or disposing of any such funds, securities, property, or other assets. . . .

Paragraph four of the Consent Order did, however, allow Mr. Nickolaou to "withdraw and utilize $2,500 per month for reasonable ordinary and necessary living expenses." The Consent Order, paragraph five, prohibited Defendants from "directly or indirectly destroying, mutilating, concealing, altering or disposing of, or refusing to permit authorized representatives of the CFTC to

inspect, when and as requested, any books and records, documents, correspondence, letters . . . . or other property of Defendants, wherever located . . . ." [3]

On January 4, 2000, the CFTC filed the instant Motion to Reconsider Award of In Forma Pauperis Status to Defendant Nicholas Nickolaou. In its motion, the CFTC argues that, during the course of discovery, it obtained information that substantially discredits Mr. Nickolaou's poverty claims.[4] The motion was referred to this Court on January 12, 2000, for a hearing, as well as a report and recommendation concerning whether civil or criminal contempt sanctions are warranted.

On January 21, 2000, this Court ordered Mr. Nickolaou to address fully each of the facts enumerated in the Spear Declaration. On February 11, 2000, Mr. Nickolaou faxed the Belize Bank requesting that his "confidentiality" be respected. (CFTC Hearing Ex. 57.) Around that same time, Mr. Nickolaou sent a

---

[3]Paragraph six included the condition that the Order would be "binding on any person who receives actual notice of this order by personal service or otherwise insofar as he or she is acting in active concert or participation with defendants."

[4] Also on January 4, 2000, the Spear Declaration was filed, outlining discrepancies between financial disclosures made by Mr. Nickolaou and the information about Mr. Nickolaou that the CFTC obtained from third parties.

"reply" letter to the Court which included a list of names of "investors" who "instructed" him and Mrs. Nickolaou with regard to WWFTA and the statement that, as "to the Belize accounts we have nothing to offer. We never had access . . . . I am sorry I ever got involved with those people." (CFTC Hearing Ex. 54.) On February 28, 2000, Mr. Nickolaou filed his response to the Spear Declaration. On March 24, 2000, Mr. Nickolaou filed an additional response, and this Court ordered him to execute a consent form authorizing the Belize Bank to forward to the CFTC all records about WWFTA dating from January of 1998 to the present. Those records were received by the CFTC just before the April 25, 2000 hearing. (Tr. at 163.)

## II. **The April 25, 2000 Hearing**

On April 25, 2000, the hearing on the referred matter was held. Mr. Nickolaou's testimony throughout the hearing was, at best, evasive and purposely confusing. Based upon this Court's careful observation of the testimony and testimonial demeanor of the witness, the Court finds Mr. Nickolaou's testimony to be totally incredible.

For example, in describing his interest in WWFTA -- an organization for which the articles of association list Mr. and Mrs. Nickolaou (and no one else) as subscribers, each taking one

6

share -- Mr. Nickolaou suggested that other mysterious and unnamed individuals controlled the organization. (CFTC Hearing Ex. 5.) He explained that he and his wife established WWFTA "upon advice of others." (Tr. at 8.) He also explained that WWFTA no longer exists because "everybody backed away and nothing was left in the company." (Tr. at 8.) Mr. Nickolaou testified that he and his wife (who were co-directors of WWFTA) directed the operations of the business "[w]hen it suited [them] to do what [they] had to do. . . ." (Tr. at 8-9.) Finally, when asked to confirm that he and his wife are the only shareholders in WWFTA, Mr. Nickolaou said "[t]hat's hard to tell . . . . We were given two shares. We were told there were a hundred. We were each given one by the attorneys who prepared this company." (Tr. at 10.) He said he never produced any documents showing proof of other shareholders "because [he] do[es] not know if there are any" and has no access to such documents, but was only told "that there would be other stockholders." (Tr. at 10.)[5]

Mary Elizabeth Spear, a CFTC investigator for the past

_____

[5]Mr. Nickolaou further maintained that WWFTA is run by other individuals when he told this Court that "[t]hey've withdrawn all their funds. They sent out the monies. They had some monies from a Mr. Green; they sent him his money back. . . ." (Tr. at 175-176; CFTC Hearing Ex. 82 at 9.)

thirteen years, also testified at the hearing. Based upon careful observation of the testimony and testimonial demeanor of the witnesses, this Court finds Ms. Spear's testimony to be credible, and certainly more credible than Mr. Nickolaou's. As to the validity of Mr. Nickolaou's suggestion that other people have an interest in or control of WWFTA, Ms. Spear testified that she "d[id]n't believe it's true," and that, in her opinion, "Mr. and Mrs. Nickolaou own and control [WWFTA]." (Tr. at 127-128.) Her opinion was based upon her contacts with people in Belize whom Mr. Nickolaou named as controllers of WWFTA, as well as a review of bank accounts, trading accounts, and other documents opened in WWFTA's name. (Tr. at 127-133; CFTC Hearing Exs. 61-62.)

Although the testimony about the existence of all the different accounts, as well as the movement and commingling of money throughout the accounts, is extremely complex and confusing, it is clear to the Court that there are abundant financial resources available to Mr. Nickolaou and that he is not in need of a court appointed attorney due to poverty.

For example, in March of 1997, Mr. Nickolaou applied for a personal Iowa Grain Company trading account. (Tr. at 11; CFTC Hearing Ex. 6.) He listed his employer as Ca-Ni, and stated that his annual income was between $50,000 and $100,000. (Tr. at 12;

8

CFTC Hearing Ex. 6.) Further, he stated that his net worth was "more than $500,000."[6] *Id.* Mr. Nickolaou also applied for an Iowa Grain Company trading account for WWFTA in March of 1998. (Tr. at 14; CFTC Hearing Ex. 7.) The annual income level checked off was "more than $100,000." *Id.* Again, net worth was listed as "more than $500,000." *Id.* Mr. Nickolaou and his wife each signed this application as co-directors of WWFTA. (Tr. at 15; CFTC Hearing Ex. 7.)

Later, Mr. Nickolaou opened a new account at Alaron Trading Corporation on behalf of WWFTA. (Tr. at 15; CFTC Hearing Ex. 8.) In his application for that account, dated June 21, 1999, he gave WWFTA's mailing address as 1862 Valleywood Way, which is the same as the Nickolaou family's home address. (Tr. at 16-17; CFTC Hearing Ex. 8.) The amount of annual income after tax was listed as "Over $100,000." (Tr. at 17-18; CFTC Hearing Ex. 8.) Mr. Nickolaou and his wife each signed the risk disclosure, and Mr. Nickolaou signed a personal guarantee, including the statement that

---

[6]In his inimitable yet typical style, at the hearing he suggested that the "X" next to the "more than $500,000" column was put there by someone else since "it [didn't] look like my X's." (Tr. at 13.) Upon further questioning, it became clear that the questions on the form <u>had</u> been filled out by someone else taking answers <u>directly from</u> Mr. Nickolaou during a phone conversation. *Id.*

his net worth, <u>excluding</u> home equity, was "$250,000-$499,999."
(Tr. at 18; CFTC Hearing Ex. 8.)  He also signed a statement giving
him authority to control the activity in the account.  (Tr. at 19.)
In mid-1999, the Iowa Grain Company accounts were closed and money
from Iowa Grain -- it is unclear whether it was from the personal
account, the WWFTA account, or both accounts -- was deposited by
Mr. Nickolaou into the WWFTA SunTrust Bank account and then moved
to the trading account at Alaron.  (Tr. at 21; CFTC Hearing Ex. 9.)
The Alaron account is still open.  (Tr. at 21.)

In addition to the WWFTA SunTrust account, Mr. Nickolaou
opened an account for Ca-Ni at SunTrust Bank and also had a
personal account at SunTrust.  (Tr. at 24.)  He and his wife are
the only signatories on those accounts.  Mr. Nickolaou also opened
a WWFTA account at Nations Bank; again he and his wife are the only
signatories.  (Tr. at 24-25.)[7]  There is also a WWFTA account at
Belize Bank, bearing the account number 5011356.  (Tr. at 26.)  Mr.
Nickolaou and his wife are listed as co-managing directors of that
account and are the beneficial owners of the account, along with
their three children.  (Tr. at 26-27; CFTC Hearing Ex. 14.)  He

---

[7]Mr. Nickolaou testified that he did not know whether all
those accounts were opened in October or November of 1999, since
his wife "handles all the paperwork" and "would have to check the
records when she did it."  (Tr. at 25.)

10

withdrew funds from that account on several occasions. (Tr. at 30; CFTC Hearing Ex. 17.)[8] For example, on August 30, 1998, he had $30,000 wire transferred to a SunTrust Bank account. (CFTC Hearing Ex. 18.)

Despite being aware of, and signatory for, the aforementioned accounts, Mr. Nickolaou incredibly claims to have no knowledge of bank statements or account balances. (Tr. at 37-38.) He instead says that his wife just gave him "some signature cards to fill out." (Tr. at 40.) From the evidence presented by the CFTC, it appears that, as of October 31, 1999, there was a combined total of $101,672.64 in the three SunTrust accounts, WWFTA Nations Bank account, WWFTA Belize Bank account, and WWFTA Alaron Trading

---

[8]It appears that there are or were at least three other Belize accounts held by Mr. Nickolaou. There was the interest bearing account to which money from account 5011356 was moved. (CFTC Hearing Ex. 17); See also CFTC Hearing Exhibit 19, which has wire instructions for account 5012948. There was also account 4011875 -- Mr. Nickolaou instructed that $297,291.28 be wired from that account on June 29, 1998. (Tr. at 36-37; CFTC Hearing Ex. 23.) However, in court, he claimed to have "no idea" about that account. (Tr. at 37.) He suggested that the CFTC ask the recipient of the wired funds, First American Title Insurance Company, about the account. *Id.* Later in his testimony, however, Mr. Nickolaou admitted that this money went towards the purchase of his Florida home.

Ms. Spear testified that, although she has been able to document only: one personal account at SunTrust; three different Ca-Ni accounts; and three accounts for WWFTA; she believes that Mr. Nickolaou has more personal and/or business accounts of which the CFTC is not yet aware. (Tr. at 136-140.)

account. (CFTC Hearing Ex. 1.) However, as of November 1999 the total for these same accounts was down to $88,560.87. (CFTC Hearing Ex. 2.) According to Mr. Nickolaou, the money transferred around and out had to be done by his wife since "[t]hat's what she told me was her share of the money that she had that was hers, plus the children's funds." (Tr. at 43.)

Throughout his testimony, Mr. Nickolaou insisted that, despite the fact that he and his wife jointly[9] owned and controlled the different accounts, the money in those accounts really belonged only to his wife and "her"[10] children. (Tr. at 44, 47-50, 53, 56, 61-63, 114, 116.) He said that the funds in the accounts "came from my wife, from her business, from her inheritance, from her side of the family. From the first day I married that woman, I have never considered anything that I happen to have mine. She has been paying for everything while I have done years of research with

---

[9]The Court notes that Mr. and Mrs. Nickolaou also jointly filed their tax returns.

[10]The children are also Mr. Nickolaou's children, despite the fact that he often refers to them as "her" children or "the" children. For example, "Mrs. Nickolaou and her children," (Tr. at 116), and "[t]he money belonged to Mrs. Nickolaou and the children." (Tr. at 114; CFTC Hearing Ex. 82, at 10.)

12

my software.[11] So I never considered it mine."[12]  (Tr. at 179.)  He says his wife always handled all of the deposits and "would commingle" the funds.  (Tr. at 62, 67-68.)  He said that "in the 20 plus years of marriage, I don't think I signed one check."  (Tr. at 181.)

The Nickolaou family home in Florida is paid in full.[13]  (Tr. at 70.)  The purchase price was roughly $376,000.  (Tr. at 70.)  According to Mr. Nickolaou, his "wife's money bought that house."  (Tr. at 71, 179.)  Checks from <u>another</u> Ca-Ni Citibank account for roughly $85,000 were made out to the Mortgage company for the Florida house.  (Tr. at 71; CFTC Hearing Ex. 36.)  An additional $297,291.28 was transferred from the Belize WWFTA account to pay for the house.  (Tr. at 72; see also n.8 supra.)  Although the house was initially contracted[14] for by Mr. Nickolaou and his wife,

---

[11]Obviously this conflicts with his October 12, 1999 declaration that his wife and children were dependent upon him for their support.

[12]Mr. Nickolaou testified that his wife ran a cleaning service with 25-35 employees, and amassed "[a]lmost half a million dollars."  (Tr. at 183.)

[13]The house appears to be quite spacious, and has a swimming pool.  (Tr. at 74; CFTC Hearing Ex. 60.)

[14]In contracting to build the home, Mr. Nickolaou stated on a mortgage pre-qualification form (dated September 28, 1997), that his annual income was $250,000 and that his assets were
(continued...)

the transaction closed in WWFTA's name. (Tr. at 74-75.) Nonetheless, Mr. Nickolaou testified that the house can not be taken away because it "is in trust. It belongs to the family." (Tr. at 182.)[15]

During the family's move from Illinois to Florida, for which the movers were paid $23,000, items were damaged and lost. (Tr. at 76.) In September, 1999, the movers paid $3,800 to Mr. Nickolaou, which was deposited to the WWFTA Nations Bank account. (Tr. at 77.) Also in September, 1999, insurance money was collected from two different companies; each company paid $18,832, and this money was also deposited to the same account. (Tr. at 78, 80; CFTC Hearing Exs. 43-45.) Again, Mr. Nickolaou incredibly testified that he really did not know anything about the claim since it "was prepared by [his] wife." (Tr. at 81.) Although the claim form indicates that, among the missing jewelry, were Mr. Nickolaou's platinum watch and a man's diamond ring, (Tr. at 82), he testified

---

[14](...continued)
"$500 + 750,000." (CFTC Hearing Ex. 38.) Mrs. Nickolaou's salary of $100,000 and assets of "over $500,000" were listed separately on the same sheet. *Id.*

[15]The Court notes that Mr. Nickolaou also counseled James Green to put the title of his home into an offshore account to protect it against a lawsuit. (CFTC Hearing Ex. 81 at 31-32, 38-39.)

14

that he did not bother to disclose the two insurance checks in his motion for appointment of counsel because the checks "belonged to [his] wife," and it "was not [his] money." (Tr. at 85.)[16]  He did not disclose the $3,800, paid directly to him  from the moving company, because "[i]t was spent." (Tr. at 85.)

From October 1998 to October 1999, approximately $22,000 in profits from Wisdom of the Ages was deposited to Ca-Ni's SunTrust account as Ca-Ni income. (Tr. at 75-76.)  However, Mr. Nickolaou did not disclose this money on his motion for appointment of counsel; he claims that he answered "to the best of [his] knowledge and information [he] had" when he stated on the form that he had received no money in the last twelve months." (Tr. at 84.)  He said he failed to disclose the $22,000 earned from Wisdom of the Ages on the form because he determined that "[i]t wouldn't have made any difference.  There was still no money when I stepped in that room." (Tr. at 84.)  Finally, he explained that he did not disclose the money "because [he] couldn't remember." (Tr. at 85.)

Mr. Nickolaou indicated that any omissions in the affidavit

---

[16]Mr. Nickolaou has testified that he cannot ask his wife for help, his wife will not "lend" him any money, and she will divorce him before giving him money to either hire an attorney or get out of jail.  (Tr. at 187, 204; Defendant Nickolaou's Sworn Declaration and Other Responses Required by Order of January 21, 2000, Ex. E at 8.)

(accompanying his application to proceed without prepayment of fees) that he submitted were due to the fact that he had "less than 10 minutes to prepare" it and because he knew he "didn't have the money then." (Tr. at 86.) Mr. Nickolaou testified that he felt he was "charged as an individual" and because he is "not a lawyer . . . . [and] was not represented . . . [he] did not have the time to fill th[e form] out properly or ask counsel, and nobody volunteered to help. . . ." (Tr. at 87.) As far as not listing the approximately $100,000 cash in the multiple accounts he controlled with his wife, he simply stated that he "didn't know what was in the Nations Bank Account [and] the money in Belize belongs to my wife, and the money in Alaron . . . belonged to the company." (Tr. at 87.) Mr. Nickolaou failed to list the two cars which his family uses because they "belong to Ca-Ni." (Tr. at 89.) He did not list two antique Cadillacs he owns because he claims "they have absolutely no value." *Id.*

In response to the November 19, 1999 Order, he stated that he did not disclose his shareholder interest in WWFTA[17] or the

---

[17]In fact, Mr. Nickolaou wrote to Judge Williams that "[a]s to World Wide Financial Traders Association I never, nor has my wife, been the owners of any stocks, bonds, options. . . etc. . . ." (Tr. at 94; CFTC Hearing Ex. 48.) Despite the fact that his wife wrote checks on the WWFTA SunTrust account for personal
(continued...)

$297,291.28 that was deposited into the WWFTA trading account because he's "not a lawyer. It never dawned on [him]." (Tr. at 93.) Nor did he disclose any personal property. He omitted the house because, he says, he does not own that property. (Tr. at 94.) Mr. Nickolaou said he failed to mention the cars or any personal property because he "was not represented by counsel to tell [him] to do that. If [he] knew it, [he] would have done it." (Tr. at 95, 97.) Mr. Nickolaou did not disclose any sales that Ca-Ni made because he "didn't remember any." (Tr. at 97-98.) He testified that his understanding was that he only had to list money that personally belonged to him as an individual. (Tr. at 98.)[18]

On January 21, 2000, this Court ordered Mr. Nickolaou to fully address each of the facts stated in the Spear Declaration. Sometime in January of 2000, Mr. Nickolaou gave wire transfer instructions, for the WWFTA Belize account, to James Green so that

------

[17](...continued)
expenses, including household expenses which Mr. Nickolaou also benefitted from, he further wrote that neither he nor his wife had ever "been compensated one cent for anything [concerning WWFTA] . . . ." (Tr. at 95-97; CFTC Hearing Ex. 48.)

[18]Despite the fact that his wife holds 51% of the shares in Ca-Ni and handles all the bank accounts, Mr. Nickolaou testified that, "[s]he has no voice [in Ca-Ni]. She has never done nothing for the company, except maybe type a letter once in a great while." (Tr. at 189.)

17

he could pay for the Wisdom of the Ages program, for a theater project, and to set up an offshore account for the title to Mr. Green's home. (Tr. at 105; CFTC Hearing Ex. 53; CFTC Hearing Ex. 81.) Mr. Green wired $35,000 to the WWFTA Belize account. (Tr. 107.) Approximately $35,000 was wired back to Mr. Green in February of 2000. (Tr. at 111; CFTC Hearing Ex. 81 at 77.) Mr. Nickolaou incredibly denied that he is the one who caused that money to be returned, rather he testified that:

> [t]he Bank of Belize caused it to be returned. . . .
> [after he called the bank requesting] please, examine the
> route in which these funds came to you. You will find
> they came from Mr. Green. They have nothing to do with
> me or my company. And after you examine them, please be
> kind enough to send them back to him.

(Tr. at 111-112; see also supra n.5.) On February 11, 2000, Mr. Nickolaou sent a letter to the Belize Bank requesting the transfer of $34,720.00 to Mr. Green. (CFTC Hearing Ex. 57.) That letter closed with the following statement:

> I expect that the bank respect the confidentiality of our
> business and refrain from giving any information to
> anyone about our business. As soon as we clear up a
> technical matter with an agency of the government here,
> we will send you proof and hope this will allow us to
> return to you as a satisfied customer.

(CFTC Hearing Ex. 57.)

Then on February 28, 2000, Mr. Nickolaou finally submitted a response to the Spear Declaration. (CFTC Hearing Ex. 51.) In that

response, he wrote that the Florida property was just a "building for our use and to have a special area set aside for an office area for the purpose of [selling *Wisdom of the Ages*.]" *Id.* Mr. Nickolaou stated that there "are very limited funds available to just survive and there are no funds to hire an attorney." *Id.* He wrote that his social security benefits "and those to our two youngest children have basically been all that we had." (*Id.*) He also wrote that one of the Belize Bank accounts had "some of [his] wife's funds included in it. She used those funds to pay her expenses and the children's expenses and general household expenses. . . . [including] charge card purchases." *Id.*[19]

Mr. Nickolaou explained that he neglected to mention Mr. Green's $35,000 wire transfer because he "didn't know what to do. . . . That's why [he] need[s] a lawyer." (Tr. at 106.) Mr. Nickolaou said that since "it wasn't [his] money. Why should [he disclose the transfer to the Court]." (Tr. at 107, 113.) Further, he testified that he never received bank account statements from Belize Bank (and therefore could not turn them over to the CFTC), because he had requested the bank "to hold off all correspondence."

---

[19]Attached as Exhibit J, to the February 28, 2000 response, is a letter from Mrs. Nickolaou explaining the family's <u>seven</u> phone lines.

(Tr. at 108-109.)

Again, during his testimony, Mr. Nickolaou had explanations for why he did not disclose financial information to the Court and the CFTC: either he did not know about the account; thought the information was already a matter of record; did not know he had to report the account; or understood that he was only to report his very own personal money. (Tr. 101-104, 113-117.)

Ms. Spear testified that the post-asset freeze disbursements for January and February of 2000 (CFTC Hearing Ex. 4), show the expenditures by accounts owned or controlled by Mr. Nickolaou were approximately $18,000. (Tr. at 150-152.) She also testified based on the account information she reviewed that, the Nickolaous had available to them, as of February 29, 2000, $78,001.38. (Tr. at 153.)

Ms. Spear testified about Mr. Nickolaou's representation that he does not own any real estate -- in her opinion she "can't believe that that's true." (Tr. at 154.) As to his statement that he does not own the house in Florida, she replied that she "would think that that's false." (Tr. at 155.) Further, she said it "seems clear that Mr. and Mrs. Nickolaou" own the Florida home. (Tr. at 158.)

Based on all of the documents she reviewed, Ms. Spear

testified that she "c[ould]n't see how it could be true [that Mr. Nickolaou has no money available to him nor had any in October of 1999 when he signed his affidavit seeking counsel]." (Tr. at 134-135; CFTC Hearing Exs. 63-67.)

## STANDARD FOR CONTEMPT

"'The ability to punish disobedience to judicial orders is regarded as essential to ensuring that the Judiciary has a means to vindicate its own authority without complete dependence on other Branches.'" *Grove Fresh Distribs., Inc. v. John Labatt Ltd.*, 888 F. Supp. 1427, 1435 (N.D. Ill. 1995)(quoting *Young v. United States ex. rel. Vuitton et Fils S.A.*, 481 U.S. 787, 796 (1987)). "The nature of contempt may be civil, criminal, or both." *Id.* Both criminal and civil contempt may be found for the very same conduct. *Grove Fresh*, 888 F. Supp. at 1435.

The distinction between civil and criminal contempt can be quite "elusive". *United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829-31 (1994)(discussing difficulty in distinguishing characteristics of civil versus criminal contempts, citing several law review articles critical of the "unworkable" distinction between the two types of contempt); *Grove Fresh*, 888 F. Supp. at 1436 ("The line between civil and criminal contempt . . . is often

blurred. . . ."); *see Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 441 (1911)(quoting *Bessette v. W.B. Conkey Co.*, 194 U.S. 324 (1904) "Contempts are neither wholly civil nor altogether criminal. And 'it may not always be easy to classify a particular act as belonging to either one of these two classes. It may partake of the characteristics of both.'").

Nonetheless, the two types of contempt are generally distinguished by the "'character and purpose'" of the sanction involved.[20] *Bagwell*, 512 U.S. at 827 (citing *Gompers*, 221 U.S. at 441). A contempt sanction is considered civil if it is designed to either compel/coerce obedience to a court order or to "compensate the parties for losses resulting from the contemnors non-compliance with a court order." *Grove Fresh*, 888 F. Supp. at 1435. The purpose behind civil contempt is "essentially remedial". *Grove Fresh*, 888 F. Supp. at 1435. Contrastingly, a contempt sanction is considered criminal if it is primarily punitive "'to vindicate the authority of the court.'" *Id.* at 1435-36 (quoting *United States v.*

_____

[20]The stated purposes, alone, are not determinative, however. *Bagwell*, 512 U.S. at 828 (citing *Gompers*, 221 U.S. at 443). Rather, "conclusions about the civil or criminal nature of a contempt sanction are properly drawn. . . 'from an examination of the character of the relief itself. . . .'" *Id.* (quoting *Hicks v. Feiock*, 485 U.S. 624, 636 (1988).

*Bayshore Assocs., Inc.*, 934 F.2d 1391, 1400 (6th Cir. 1991)).

Civil contempt requires proof that the District Court entered "'a lawful order of reasonable specificity . . . [which] was violated.'" *Grove Fresh*, 888 F. Supp. at 1436 (quoting *Matter of Betts*, 927 F.2d 983, 986 (7th Cir. 1991)). The evidence of these two elements of civil contempt must be clear and convincing. *Id.* Civil contempt sanctions are viewed as "nonpunitive and avoidable." *Bagwell*, 512 U.S. at 831. Criminal contempt, however, is viewed as punitive and, therefore, additionally requires a finding that the violation of the order was "willful." *Id.* at 1436. Moreover, criminal contempt requires a jury trial and uses the standard of reasonable doubt. *Grove Fresh,* 888 F. Supp. at 1436.

## DISCUSSION

The CFTC is seeking both civil and criminal contempt in this case. The CFTC argues that the evidence clearly and convincingly supports a finding of civil contempt, and also shows, beyond a reasonable doubt, the willfulness and obstruction of justice that would support a finding of criminal contempt. Under either type of contempt, the CFTC seeks Mr. Nickolaou's incarceration until he provides for his release by "finally fully, and honestly, complying with the Court's orders." (Tr. at 200.) The CFTC does not seek

monetary sanctions.

To support a finding of contempt, the CFTC argues that Mr. Nickolaou has consistently and deliberately lied about: his ownership and involvement with WWFTA; the money he has in the bank; the income and funds he has received; his home ownership and other assets. (Tr. at 197-198.) The CFTC also argues that Mr. Nickolaou failed to make full disclosures in his October 12, 1999 affidavit, and pursuant to two separate Court orders. (Tr. at 198.) Finally, the CFTC argues that, although he was prohibited from concealing assets, Mr. Nickolaou secreted funds to Belize and to a Nations Bank, and that he obstructed the fact finding process by instructing the Belize Bank not to disclose information. (Tr. at 198-199.)

The Court first addresses civil contempt. As discussed previously above, civil contempt is essentially remedial, as opposed to punitive, and is designed to either compel an individual's obedience to a court order or to compensate for losses resulting from the individual's disobedience. Civil contempt requires clear and convincing proof that the District Court entered "'a lawful order of reasonable specificity . . . [which] was violated.'" *Grove Fresh*, 888 F. Supp. at 1436 (quoting *Matter of Betts*, 927 F.2d 983, 986 (7th Cir. 1991)).

It is this Court's determination that the CFTC has failed to show, by clear and convincing evidence, that Mr. Nickolaou violated the District Court's orders in such a way that civil contempt is warranted. This is not intended to suggest that Mr. Nickolaou's statements and behavior are above reproach, because they obviously are greatly lacking. Far from the humble, innocent, and naive persona he attempts to project, Mr. Nickolaou is actually a clever, perhaps brilliant, and crafty man. He obviously knows where the line of demarcation between mere incredulity and perjurious testimony lies and has adroitly managed to approach that line without clearly crossing it. Just when it appears that Mr. Nickolaou's testimony and written submissions are so incredible as to be downright perjurious, he manages to have left himself just enough wiggle room to stave off such a definitive finding.

As the Court discussed before, Mr. Nickolaou's testimony at the April 25, 2000 hearing was totally incredible. Although Ms. Spear was a very credible witness, her testimony does not clearly and convincingly support a civil contempt finding. Her testimony stopped short of specifically stating that Mr. Nickolaou was not telling the truth. Instead, Ms. Spear appeared to qualify each of her statements, rather than emphatically testifying that what Mr. Nickolaou said was false.

For example, as to the validity of Mr. Nickolaou's suggestion that other people have an interest in or control of WWFTA, Ms. Spear testified: "I <u>don't believe</u> it's true." (Tr. at 127-128.)(emphasis added). As another example, Ms. Spear testified that she "<u>c[ould]n't see how</u> it could be true" that Mr. Nickolaou has no money available to him nor had any in October of 1999 when he signed his affidavit seeking counsel. (Tr. at 134-135.) (emphasis added). Further, Ms. Spear said, about Mr. Nickolaou's representation that he does not own any real estate, that she "<u>can't believe</u> that that's true." (Tr. at 154.)(emphasis added). As to his statement that he does not own the house in Florida, she replied that she "<u>would think</u> that that's false." (Tr. at 155.)(emphasis added). Finally, she said it "<u>seems clear</u> that Mr. and Mrs. Nickolaou" own the Florida home. (Tr. at 158.) (emphasis added).

As to the CFTC's argument that Mr. Nickolaou failed to make full disclosures in his October 12, 1999 affidavit, his response is that, on that date, he was confused, rushed, and without the advice of an attorney. He even wrote on his motion for appointment of counsel that he did not know how to proceed in forma pauperis. As to his other failures to respond, he has stated that any mistakes he has made are due to his advanced age (70), and the fact that he

26

is "befogged by medication" (Tr. at 179) and forgetful. (Tr. at 177.) If the CFTC had pointed to particular information that he has not provided, then the civil contempt remedy of incarceration that the CFTC seeks would be more palatable. Mr. Nickolaou could turn over that information and open his own jailhouse door. However, the CFTC has not pointed to any such specific information here.

As to a violation of the asset freeze, according to Mr. Nickolaou, it was his wife who removed "her" money from the accounts. The Consent Order states that "Defendants" shall not remove money. Mrs. Nickolaou, however, is not a defendant. Although paragraph six of the Consent Order states that it shall be "binding on any person who receives actual notice of this order by personal service or otherwise insofar as he or she is acting in active concert or participation with defendants," the CFTC has not alleged that Mr. Nickolaou violated the order through his wife, who was acting in concert with him. Additionally, it is not clear that Mrs. Nickolaou was aware of the Consent Order, since neither side called her to testify. By ignoring Mrs. Nickolaou, it almost appears that the CFTC has assented to Mr. Nickolaou's explanation that his wife has her own money (albeit in joint accounts with him) and is not involved in Ca-Ni or any of his other financial

endeavors, although the evidence would suggest otherwise. Therefore, holding Mr. Nickolaou in civil contempt for Mrs. Nickolaou's actions would not be warranted. Moreover, incarcerating him for these actions is not an appropriate civil contempt remedy since the CFTC does not seek either compensation for losses resulting from his disobedience or to compel his obedience.

Next, the CFTC argues that, although he was prohibited from concealing assets, Mr. Nickolaou secreted funds to the Belize Bank. It appears that the CFTC is referring to Mr. Green's $35,000. The Consent Order did not prohibit Mr. Nickolaou from depositing money after the asset freeze, and it is possible that the propriety of removing the post-freeze deposit could be argued to be somewhat ambiguous under the Consent Order. However, even if it is deemed a clear violation of the Consent Order, incarceration is (again) inappropriate here since there is no specific remedy sought by the CFTC that would enable Mr. Nickolaou to free himself of the civil contempt.

Lastly, the CFTC argues that Mr. Nickolaou obstructed the fact finding process by instructing the Belize Bank not to disclose information. Again, even though it appears that Mr. Nickolaou's letter did obstruct the process for a time, the CFTC now has the

Belize Bank information it wanted, because Mr. Nickolaou wrote another letter (pursuant to this Court's Order) instructing the bank to release the information. Similar to the other instances addressed above, it would not make sense to incarcerate Mr. Nickolaou for civil contempt in this situation because the CFTC is not seeking compensation for losses resulting from his disobedience or to compel his obedience (he has already complied and the CFTC has the documents).

In summary, even if all of the CFTC's allegations were clearly and convincingly shown here, the relief that the CFTC seeks is unreasonably vague. If Mr. Nickolaou clearly and convincingly violated court orders or failed to disclose information, then the CFTC should have been able to specify exactly what information or documentation he needs to provide in order to no longer be held in contempt, and open his own jail house door. Instead, the CFTC only ambiguously states that Mr. Nickolaou should be jailed until he "fully and honestly" complies with court orders. Thus, although the CFTC purports to seek civil contempt in additional to criminal contempt, it appears that what the CFTC really wants is simply for Mr. Nickolaou's apparent dishonesty and disobedience to be punished.

Criminal contempt is primarily punitive "'to vindicate the

authority of the court.'" *Grove Fresh*, 888 F. Supp. at 1435-36 (quoting *United States v. Bayshore Assocs., Inc.*, 934 F.2d 1391, 1400 (6th Cir. 1991)). Criminal contempt requires a finding that the individual wilfully violated the District Court's order, requires a jury trial, and uses the standard of reasonable doubt. *Id.* at 1436.

Although it certainly should be considered a future option, criminal contempt seems, at this time, to be premature based upon the evidence presented at the April 25, 2000 hearing. Despite the fact that Mr. Nickolaou's testimony lacked credibility and believability, in this Court's opinion, Ms. Spear's testimony was simply not concrete enough to support a jury finding, beyond a reasonable doubt, that he wilfully violated a court order. Therefore, it is this Court's determination that, while Mr. Nickolaou is skating on dangerously thin ice, the CFTC has not yet shown that he has broken through to the point of contempt.

<u>CONCLUSION</u>

Although it appears that both the CFTC and Mr. Nickolaou have left just enough wiggle room for him to avoid contempt sanctions at this time, the fact remains that tens of thousands of dollars have moved in and out of the many different accounts for which Mr. Nickolaou is a signatory. There still are tens of thousands of

30

dollars in some of those accounts. Based upon the information presented to this Court, it is clear that Mr. Nickolaou has access to ample resources and, consequently, is not entitled to a court appointed attorney.

Therefore, although this Court recommends that Defendant Nicholas Nickolaou not be held in either civil or criminal contempt; this Court does recommend that the Motion to Reconsider Award of In Forma Pauperis Status to Defendant Nicholas Nickolaou be granted. [21]

DATED: July 25, 2000          RESPECTFULLY SUBMITTED:

ARLANDER KEYS
United States Magistrate Judge

Counsel have ten days from the date of service to file objections to this Report and Recommendation with the Honorable Paul E. Plunkett. *See* FED. R. CIV. P. 72(b); 28 U.S.C. §636(b)(1). Failure to object constitutes a waiver of the right to appeal. *Egert v. Connecticut Gen. Life Ins. Co.*, 900 F.2d 1032, 1039 (7th Cir. 1990).

---

[21]Despite the fact that Mr. Nickolaou will likely continue to represent himself, and will be afforded some leniency due to his pro se status, he should consider himself warned that any future failures to disclose or produce information or the submission of false or misleading information may result in criminal contempt proceedings. He should take no comfort in this Court's decision not to recommend sanctions in this instance.